**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
CINCINNATI DIVISION**

| | | |
|---|---|---|
| **LUIS ANTONIO AGUILAR MARQUINEZ,** *et al.*, | : : | Case No. 1:20-mc-00042-SJD-SKB |
| Plaintiffs | : : : | In Re: Subpoena issued in Civil Action 1:12-CV-00695-RGA (pending in United States District Court for the |
| vs. | : : | District of Delaware) |
| **DOLE FOOD COMPANY INC.,** *et al.*, | : : | **MEMORANDUM IN SUPPORT OF MOTION TO QUASH SUBPOENA** |
| Defendants | | |

**I. INTRODUCTION**

More than 20 years ago, the Cincinnati Enquirer published a series of news reports regarding Defendant Chiquita Brands International, Inc. ("Chiquita"). Plaintiffs' Subpoena to The Enquirer seeks the production of records and to depose Regional Vice President Eddie Tyner about information that may have been obtained in the course of that professional newsgathering activity. (See Subpoena, attached hereto as **Exhibit A**). Specifically, the Subpoena commands Mr. Tyner to produce records and testify regarding unpublished information related to the Enquirer's reporting on Chiquita's business activities in Latin America.

Even if The Enquirer had any information about Chiquita's operations to share with Plaintiffs (The Enquirer's initial search indicates The Enquirer does not appear to have retained the decades old documents sought), none of it could be material, relevant, or necessary to the Plaintiffs' claims in the underlying litigation. Indeed, the United States District Court for the District of Delaware has already expressly ruled that the information Plaintiffs claim they need from The Enquirer -- including the alleged internal Chiquita report that Plaintiffs contend is the

focus of the Subpoena -- is neither material nor relevant to their claims, and may not even be compelled to be produced by Defendant Chiquita. (See Transcript of Proceedings, 11:15, attached hereto as **Exhibit B**).

In 1998, The Enquirer published a series of news articles for the *Cincinnati Enquirer* regarding Chiquita Brands, Inc. ("Chiquita"). One such article published in May of 1998, entitled "CHIQUITA SECRETS REVEALED: Hidden control crucial to overseas empire" (Plaintiffs attached the "Chiquita Article," to the Subpoena as Exhibit A-1). The Chiquita Article reported on aspects of Chiquita's business dealings throughout Latin America. Among other things, the Chiquita Article described Chiquita's alleged attempts to obscure its ownership of property in Ecuador and other Latin American countries, but expressly noted that these plans "never became fully operational because there was a glut of bananas in the European market and prices plummeted in 1992, forcing [Chiquita] to half its expansion plans in [Ecuador] at that time, according to company sources." The Chiquita article, however, makes no mention of the chemical at issue in the underlying lawsuit.

## A. *Marquinez, et al v. Dole Food Company, Inc. et al*

On May 31, 2012, a group of foreign nationals from Panama and Ecuador (the "Plaintiffs") filed suit against Dole Food Company and others in the United States District Court for the District of Delaware, asserting claims for, *inter alia*, negligence, strict liability, breach of implied warranty, and conspiracy arising out of allegations that they sustained personal injuries as a result of exposure to a harmful chemical commonly known as DBCP (*See* Complaint, attached hereto as ***Ex. C***.) Plaintiffs allege that they were exposed to this chemical while working on banana-growing plantations in Costa Rica, Ecuador, and Panama, *id.* ¶ 5, and that the Standard Fruit Company (now a subsidiary and the alter ego of Dole) and the United Fruit

2

Company (now Chiquita) engaged with manufacturers such as Dow Chemical Company and Shell Oil Company to produce DBCP and distribute DCBP to their banana growing operations in Costa Rica, Panama, and Ecuador, despite evidence that the chemical had deleterious side effects including infertility. *Id.* ¶ 17.

On January 8, 2020, the Ecuadorean Plaintiffs in the lawsuit served Chiquita with a document request for a specific 1992 Chiquita financial report allegedly authored by Chiquita financial analyst Paul White (the "White Report"). Plaintiffs contend that this Report detailed the complex historical and contemporary ownership structure of Chiquita's Ecuadorean banana operations. (*See* Ecuadorean Plaintiffs' Discovery Mot. at 3., attached hereto as ***Ex. D***.) Plaintiffs argued that "[t]his report is relevant because it will directly contradict Chiquita's sworn declarations that it has had no ownership interest in any Ecuadorean banana growing operations after 1965." *Id.*

Chiquita opposed Plaintiffs' document request, arguing that "[t]he only evidence Ecuadorean Plaintiffs have offered that this alleged report exists is an article authored 22 years ago that was subsequently retracted." *Id.* at 4. Chiquita also asserted that it "has been searching for this alleged report for several months, has not located it, and indeed has no reason to believe that it ever existed." *Id.*

In a hearing on April 23, 2020, the United States District Court for the District of Delaware heard argument on, and expressly denied, Plaintiffs' motion to compel Chiquita's production of the White Report. (*See* Hearing Transcript at 11:15, attached hereto as ***Ex. B***.) The court relied on an article Cameron McWhirter[1] authored for the Columbia Journalism Review in 2008 (*see* the "Columbia Article," attached hereto as ***Ex. E***), in which he recounted the

---

[1] Mr. McWhirter was one of the reporters who authored the Chiquita Article. Mr. McWhirter was not implicated in any wrongdoing related to the Chiquita Article.

3

circumstances that led the *Cincinnati Enquirer* to retract and disavow the Chiquita Article. The court opined that "[t]here couldn't be more affirmative evidence that the articles which [Plaintiffs] seek are the subject of this retraction which was redacted, taken back…disclaimed, and asserted to be untrue." **Ex. B** at 10:24. The court also noted that the circumstances surrounding the Chiquita Article created doubt about whether the White Report ever even existed at all. *See id.* at 8:2-8:8. For those reasons, the court denied Plaintiffs' motion to compel Chiquita's production of the White Report.

**B. The Enquirer Subpoena**

In an effort to end-run the District Court's ruling, Plaintiffs served The Enquirer with the Subpoena on or about September 25, 2020.

The Subpoena commands The Enquirer to appear in person at a location in Cincinnati, Ohio on November 20, 2020 for a deposition. The Subpoena also commands The Enquirer to produce 15 categories of documents, including, *inter alia*: "All documents in your possession, custody, or control, or to which you have reasonable access, regarding the investigation, reporting, and/or publication by the *Cincinnati Enquirer* on [Chiquita], and any of Chiquita's affiliates or subsidiaries, that led to the *Cincinnati Enquirer*'s May 3, 1998 publication entitled "Chiquita Secrets Revealed." (See **Exhibit A**). Among other items, the Subpoena seeks the personnel files of two reporters who worked on the Chiquita Article, along with the record retention schedule of The Cincinnati Enquirer.

The Subpoena seeks to have The Cincinnati Enquirer act as plaintiffs' investigative arm, as its sweeping requests quite simply demand The Enquirer turn over its files for an unlimited inspection by plaintiffs.

4

Because the burden imposed by the Subpoena is facially untenable, The Enquirer has not performed a thorough search for or review of the documents subject to the Subpoena. Simply reviewing the Subpoena, however, makes it clear that the Subpoena seeks material subject to the attorney client and work product privileges, as well as material that could reveal confidential sources. Confidential source material is subject to a privilege under Ohio law – Ohio Rev. Code 2739.12.

On October 10, Counsel for The Enquirer delivered to plaintiffs' counsel a letter objecting to the Subpoena and requesting that plaintiffs withdraw the Subpoena in its entirety. On October 19, counsel for plaintiffs submitted a "scaled back" request, which still presented five broad requests:

1. All documents in your possession, custody, or control, or to which you have reasonable access, regarding either (1) the **Nominee** form of ownership or (2) the **Trust** form of ownership used by Chiquita, and any of Chiquita's affiliates or subsidiaries, to structure ownership of banana growing operations in Ecuador as described in Exhibit A-1, The *Cincinnati Enquirer's* May 3, 1998 publication entitled "Chiquita Secrets Revealed" at DBCP.Plaintiffs.Chavez.0101931-DBCP.Plaintiffs.Chavez.0101938 DBCP.Plaintiffs.Chavez.0102025.

2. The 1992 report written by financial analyst Paul M. White regarding the ownership structure of Ecuadorian banana growing operations identified in the May 3, 1998 *Cincinnati Enquirer* publication entitled "Chiquita Secrets Revealed," which was referenced in the publication as follows:

   *Ecuador*
   *Chiquita also used the trust structure to set up supposedly independent banana farm companies in Ecuador. A March 1992 internal company report reveals that Chiquita wanted to hide its control of those companies.*

   *Written by Chiquita financial analyst Paul M. White, the report described the company's rationale for restructuring its Ecuadoran operations and the company officials' belief that it complied with Ecuadoran law.*

   *"CBI (Chiquita Brands International) prefers that some of its Ecuadoran operations remain anonymous in order to facilitate relationships with unions, governments and suppliers. By giving the perception of Cartonera Andina being independent, for*

5

> *example, CBI is able to reduce costs, and maintain improved relationships with the above groups.*
>
> *"Union negotiations. By having more companies, and thus more unions, CBI is able to reduce its exposure to strikes and increase its bargaining position," the White report stated.*
>
> For reference, please see **Exhibit A-1**, *The Cincinnati Enquirer*'s May 3, 1998 publication entitled "Chiquita Secrets Revealed."

3. All documents in your possession, custody, or control, or to which you have reasonable access, pertaining to the case captioned *Ventura v. Cincinnati Enquirer*, et al, No. 1:99-cv-00793-HJW-JS (S.D. Ohio)**,** including all statements given under oath to include verified discovery responses, affidavits, declarations, deposition testimony, and trial testimony in the matter.

4. All documents in your possession, custody, or control, or to which you have reasonable access, pertaining to the lawsuit case captioned *Chiquita Brands Intl v. Gallagher*, No. 1:98-cv-00467-SJD (S.D. Ohio), including all statements given under oath to include verified discovery responses, affidavits, declarations, deposition testimony, and trial testimony in the matter.

5. All documents in your possession, custody, or control, or to which you have reasonable access, produced in the State of Ohio's investigation into George Ventura's actions related to the to *The Cincinnati Enquirer*'s publication entitled "Chiquita Secrets Revealed" on May 3, 1998 and all non-privileged correspondence regarding that investigation.

The "scaled down" request continues to seek whole files, and privileged materials, none of which concern the issues in the underlying lawsuit. The Subpoena is an unwarranted fishing expedition foisted on a non-party that imposes an undue burden not tolerated by the Federal Rules of Civil Procedure. This Court should quash the Subpoena in its entirety.

**C. DISCUSSION**

Although many federal Circuit courts have recognized a privilege for materials gathered in the process of publishing news, the Sixth Circuit rejected this notion in the case of *In re Grand Jury Proceedings*, 810 F. 2d 580 (6th Cir. 1987). But notwithstanding that

6

decision, the Court in the *In re Grand Jury Proceedings* case adopted a "balancing of interests" approach to apply in cases such as this one, where a civil litigant seeks newsgathering materials from a non-party. The Court noted:

> "In the sense that the balancing referred to by Justice Powell [in *Branzburg*], when instigated by a reporter seeking to protect a confidential source, may result in the denial to a party of the use of evidence which is reliable, one is reminded of the invocation of a 'privilege,' as contrasted with an 'exclusion' which prohibits the introduction of evidence which is unreliable or calculated to mislead or prejudice. But, this balancing of interests should not then be elevated on the basis of semantical confusion, to the status of a first amendment privilege. Instead, courts should, as did the Michigan state courts, follow the admonition of the majority in *Branzburg* to make certain that the proper balance is struck between freedom of the press and the obligation of all citizens to give relevant testimony ..." (footnote omitted). *Id.* at 585-586

In the case of *In re Daimler Chrysler AG Securities Litigation,* 216 F.R.D. 395, 403 (E.D. Mich. 2003) a litigant sought discovery from two non-party reporters who had written extensively on the subject of the underlying litigation. In denying a motion to compel, the court provided a road map for applying the balancing of interests standard. It noted that the Federal Rules of Civil Procedure provide guidance at Rule 26(b)(2):

> "The frequency or extent of use of the discovery methods otherwise permitted under these rules and by any local rule shall be limited by the court if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues. The court may act upon its own initiative after reasonable notice or pursuant to a motion under Rule 26(c)."

In the *Chrysler* case, the court noted that "[m]uch, if not all of the evidence the Plaintiffs seek from the Respondents may well be obtainable from other sources . . . ." Id. at 403. And so too, any information sought by plaintiffs here is available from the parties to the litigation or

their employees. If those materials no longer exist after a nearly quarter of a century, that does not give plaintiffs the right to the discovery equivalent of a Hail Mary pass and force a non-party to engage in a costly and time consuming search for the records. In the *Chrysler* case, the party seeking the discovery complained that it would need to go through the Hague Convention to obtain testimony from witnesses with direct knowledge. The court ruled this was no excuse for ignoring those sources, and looking to the reporters for the information.

In this case, any relevant information related to the operation of the Chiquita company is available from the Chiquita company and its employees. If plaintiffs experience difficulty in obtaining the information from Chiquita, it can seek relief from the court in the underlying litigation. Indeed, it has and that court declined to compel the production of the material. This court should do the same.

The *Chrysler* court also noted that: "[a]s originally framed in the subpoenas, the information Plaintiffs seek is exceedingly broad, and hence would be exceedingly burdensome, both in terms of the number of witnesses and the time frame involved." *Id.* at 404

The same considerations apply here. Plaintiffs drafted the Subpoena in the broadest possible terms – seeking for example, "all documents" "pertaining" to various court actions (none of which remotely involve the allegations in the underlying litigation). "All" means every single scrap of paper. And "pertaining" means in any way related to. Plaintiffs could have been less wordy and asked for "the entire content of all of your files," since that is what they seek. A non-party ought not be required to seek out and review materials from a 22 year old news story that has no connection to the underlying litigation.

The *Chrysler* court also noted that given the availability of depositions of employees of the parties in the underlying lawsuit, the materials sought from the reporters were by definition

8

cumulative. As the court noted, "the Plaintiffs' ability to depose the witnesses provides 'an ample opportunity by discovery in the action to obtain the information sought.' (citation omitted) . . . . Plaintiffs have not offered anything beyond a generalized claim of relevance to show that the information they seek is not cumulative." *Id.* at 404-05. The same considerations apply here.

      The *Chrysler* court also noted:

> "[t]he discovery decisions of both the District Judge and the Special Master in the underlying Delaware case limited Plaintiffs' total depositions to 15, based on the court's informed and reasoned assessment of the complexity and size of the case, along with an examination of the Rule 26(b)(2) factors. One must question whether a subpoena of the Respondents' files, particularly where Plaintiffs have not exhausted other discovery and investigative options, is in effect an attempt to circumvent those limitations." *Id.* at 405-406.

Here, the plaintiffs are seeking to circumvent the decision on a motion to compel in the underlying litigation by seeking discovery from The Enquirer.[2]

The *Chrysler* court also made the very astute observation that civil litigants ought not be permitted to turn non-party reporters or newspapers into their "private discovery agents." The court cited to the case of *Gonzales v. Nat'l. Broadcasting Co., Inc.,* 194 F. 3d 29, 35 (2d. Cir. 1999) where that court held:

> "If the parties to any lawsuit were free to subpoena the press at will, it would likely become standard operating procedure for those litigating against an entity that had been the subject of press attention to sift through the press files in search of information supporting their claims. The resulting wholesale exposure of press files to litigant scrutiny would burden the press with heavy costs of subpoena compliance, and could otherwise impair its ability to perform its duties— particularly if potential sources were deterred from speaking to the press, or insisted on remaining anonymous, because of the likelihood that they would be sucked into litigation ... And permitting litigants unrestricted, court-enforced access to journalistic resources would risk the symbolic harm of making

---

[2] Plaintiffs have also served a subpoena in Atlanta on former Enquirer reporter Cameron McWhirter for materials from the Chiquita article. Mr. McWhirter has filed a motion to quash. See *Case No. 1:20-mi-99999,* U.S. District Court for the Northern District of Atlanta.

9

journalists appear to be an investigative arm of the judicial system, the government, or private parties." *Chrysler* at 406.

Plaintiffs here are unquestionably seeking to have The Enquirer serve as its discovery agent. This is, quite simply, not The Enquirer's job.

The *Chrysler* case also noted that it was significant that a Michigan statute protected much of the requested discovery from disclosure. *Id.* at 406. Here, given the Subpoena's sweeping language, it requests materials covered by Ohio Rev. Code §2739.12, which provides newspaper reporters cannot be compelled to reveal the source of information gathered in the course of newsgathering. This consideration, which played a factor in the *Chrysler* court's denial of the motion to compel, applies equally here.

**CONCLUSION**

Plaintiffs seek to conscript The Cincinnati Enquirer into the role of special investigator for their litigation pending in Delaware. This is an unacceptable practice generally, but especially so when the reporting is over 20 years old, and does not concern the claims at issue in the underlying lawsuit. This court should quash the Subpoena in its entirety, and award The Enquirer its attorneys' fees and costs incurred in connection with this motion.

Respectfully submitted,

  */s/ John C. Greiner*
John C. Greiner (0005551)
*Counsel for Defendants*
GRAYDON HEAD & RITCHEY
312 Walnut Street
Suite 1800
Cincinnati, OH 45202-3157
Direct: (513) 629-2734
Fax: (513) 333-4316
E-Mail: jgreiner@graydon.law

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the within and foregoing Memorandum in Support of Motion to Quash Subpoena was served upon counsel of record for Plaintiffs and Defendants via email and first-class mail as follows:

Andrew Caulfield Dalton
**Dalton & Associates P.A.**
Cool Spring Meeting House
1106 West Tenth Street
Wilmington, DE  19806
302-652-2050
adalton@bdaltonlaw.com

Scott M. Hendler
**Hendler Flores Law, PLLC**
The Park Terrace Building
1301 W. 25th Street, Suite 400
Austin, TX  78705
512-439-3200
shendler@henderlaw.com

*Counsel for Plaintiffs*

John C. Phillips, Jr.
**Phillips, McLaughlin & Hall, P.A.**
1200 N. Broom Street
Wilmington, DE  19806
302-644-4200
jcp@pgmhlaw.com

*Counsel for Defendant AMVAC Chemical Corporation*

Brandon W. McCune
Adam V. Orlacchio
Emery Gillickson Richards
**Blank Rome LLP**
1201 North Market Street, Suite 800
Wilmington, DE  19801-4226
302-425-6406
bmccune@blankrome.com
orlacchio@blankrome.com
erichards@blankrome.com

R. Jack Reynolds
Samuel E. Stubbs
**Pillsbury Winthrop Shaw Pittman LLP**
2 Houston Center
909 Fannin, Suite 2000
Houston, TX  77010
713-276-7600
Jack.reynolds@pillsburylaw.com
Sam.stubbs@pillsburylaw.com

Steven L. Caponi
**K&L Gates LLP**
600 N. King Street, Suite 901
Wilmington, DE  19801
302-416-7080

*Counsel for Defendants Chiquita Brands International, Inc., Chiquita Brands, LLC, Chiquita Fresh North America LLD*

Stephanie E. O'Byrne
Jennifer Catheron Wasson
**Potter Anderson & Corroon, LLP**
1313 N. Market St., Hercules Plaza, 6th Floor
P.O. Box 951
Wilmington, DE  19899-0951
302-984-6067
sobyrne@potteranderson.com
jwasson@potteranderson.com

*Counsel for Defendants Dole Food Company, Inc. and Dole Fresh Fruit Co.*

William Edward Gamgort
Timothy Jay Houseal
Jennifer Marie Kinkus
**Young, Conaway, Stargatt & Taylor LLP**
Rodney Square
1000 North King Street
Wilmington, DE  19801
302-571-6682
wagamgort@ycst.com
thouseal@ycst.com
jkinkus@ycst.com

R. Morgan Gilhuly
Stephen C. Lewis
**Barg, Coffin, Lewis & Trapp LLP**
600 Montgomery Street, Suite 525
San Francisco, CA  94111
415-228-5400
mgilhuly@bargcoffin.com
slewis@bargcoffin.com

Vickie Rachal Thompson
**Strong Pipkin Bissell & Ledyard LLP**
595 Orleans, Suite 1400
Beaumont, TX  77701
409-981-1000
vthompson@strongpipkin.com

*Counsel for Defendant Occidental Chemical Corporation*

James W. Semple
**Cooch and Taylor P.A.**
The Brandywine Building
1000 N. West Street, 10th Floor
Wilmington, DE  19801
302-984-3842
Jsemple@coochtaylor.com

*Counsel for Defendant Del Monte Fresh Produce N.A., Inc.*

Michael L. Brem
**Schirrmeister Diaz-Arrastia Brem LLP**
Pennzoil Place – South Tower
711 Louisiana Street, Suite 1750
Houston, TX  77002
713-221-2500
mbrem@sdablaw.com

*Counsel for Defendant Dow Chemical Company*

Kelly E. Farnan
**Richards, Layton & Finger, PA**
One Rodney Square
920 N. King Street
Wilmington, DE  19801
302-651-7705
farnan@rlf.com

Leila M. Morgan
Anneke Shepard
Craig A. Stanfield
**King & Spalding LLP**
1100 Louisiana, Suite 4100
Houston, TX  77002
713-751-3200
lmorgan@kslaw.com
ashepard@kslaw.com
castanfield@kslaw.com

*Counsel for Defendant Shell Oil Company*

        Stephanie E. O'Byrne
        Jennifer Catherine Wasson
        **Potter Anderson & Corroon, LLP**
        1313 N. Market Street
        Hercules Plaza, 6th Floor
        P.O. Box 951
        Wilmington, DE  19899-0951
        302-984-6067
        sobyrne@potteranderson.com
        jwasson@potteranderson.com

        *Counsel for Defendants Standard Fruit Company and Standard Fruit and Steamship Company*

This 4th day of November, 2020.

        */s/ John C. Greiner*
        John C. Greiner (0005551)

10648923.1
10649389.1