**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

LUIS ANTONIO AGUILAR
MARQUINEZ, et al.,                                    Case No. 1:20-mc-042

                Plaintiffs,                      Dlott, J.
                                                      Bowman, M.J.
     v.

DOLE FOOD COMPANY INC., et al.,

                Defendants.


**MEMORANDUM OPINION AND ORDER**

On November 4, 2020, The Cincinnati Enquirer, a division of Gannett GP Media, Inc. ("The Enquirer") filed a motion to quash a subpoena pertaining to an underlying lawsuit in the District Court of Delaware. *See Marquinez v. Dole Food Company Inc.,* Case No. 1:12-cv-695-RGA-SRF. The subpoena directs the Enquirer to appear and give testimony, and to produce 15 categories of documents that generally relate to an investigative journalism article ("the Article") that was initially published on May 3, 1998, but subsequently retracted by The Enquirer. For the following reasons, The Enquirer's motion to quash is granted.[1]

---

[1]Based upon the extensive briefing and exhibits, which include the transcripts of two hearings held by other courts encompassing nearly identical discovery requests, oral argument is unnecessary for disposition of the pending motion.

I.      **Background**

A.  **The Underlying Delaware Case: Case No. 1:12-cv-695-RGA**

In the underlying Delaware lawsuit, Plaintiffs, who are foreign nationals, allege that multiple U.S. corporations exposed them to a toxic pesticide while Plaintiffs were working on banana plantations in Ecuador, Costa Rica, and Panama in the 1960s through the 1980s. (May 31, 2012 Complaint).[2]  The pesticide was not used after 1985. (Doc. 2-2 at 22, PageID 153). Relevant to the subpoena at issue, Plaintiffs allege that a group referred to as the "Chiquita Defendants" (hereafter "Chiquita") is liable based upon Plaintiffs' exposure to the pesticide in "Costa Rica or Panama." (Complaint at ¶¶29, 31, 44). The 2012 *Marquinez* complaint generally alleges exposure to the pesticide in Ecuador on farms owned or controlled by other corporate Defendants. Chiquita has denied under oath that it owned, operated, or otherwise controlled banana plantations in Ecuador during the relevant years at issue. (Doc. 9, Exh. 1-3).[3]

Notwithstanding the lack of any direct allegation concerning Chiquita's control or ownership of farms in Ecuador in the original complaint, Plaintiffs now characterize the *Marquinez* claims against Chiquita as involving "injuries from exposure to DBCP sustained on banana plantations **in Ecuador**, because of Chiquita's participation and

---

[2]Plaintiffs' counsel filed multiple cases containing similar allegations. Pursuant to the parties' stipulation, the *Marquinez* case was consolidated solely for pretrial management purposes on November 29, 2012 with a second case, *Chavez v. Dole Food Co.*, Case No.1:12-cv-697-RGA. (See Docs. 47, 48 in Case No. 1:12-cv-695-RGA). The *Chavez* action itself consists of six cases separately consolidated under that case number.

[3]Plaintiffs argue that Chiquita's denial of control contradicts statements in Annual Reports by its predecessor companies that those companies entered into contracts with "Associate Producers" in Ecuador. (Doc. 9-4).

assistance in licensing DBCP and keeping it on the market **or** its acts furthering the conspiracy among the various Defendants to place and keep DBCP on the market, **or** its operation and control of the plantations where Plaintiffs sustained their injurious exposures to the toxic chemical." (Doc. 9 at 10, PageID 295, emphasis added).  Plaintiffs allege that the documents underlying the publication of the Article as well as documents relating to lawsuits filed after the publication of the Article will help them prove claims relating to their Ecuadoran exposure attributable to Chiquita.

### B.  The Article

On May 3, 1998, some 13 years after the last use of the pesticide at the heart of the underlying litigation, The Enquirer published an 18-page Article entitled "CHIQUITA SECRETS REVEALED: Hidden control crucial to overseas empire" (previously referenced as "the Article").  The article was one of a series of articles in a multi-part exposé spanning a wide range of topics about Chiquita's business practices in several countries in Latin America, published under the byline of journalists Michael Gallagher and Cameron McWhirter.

The specific Article that is the focus of the subpoena makes no mention of the pesticide at issue in the underlying lawsuit. Instead, the Article posits that Chiquita "secretly controls dozens of supposedly independent banana companies in Latin America" "through an international trust structure designed to avoid restrictions of land ownership and national security laws."  (Doc. 2-1 at 10, PageID 30).  Although the Article focused on Honduras, the Article reported that "nominee" and "trust" types of ownership,

as well as subsidiary ownership, were used in Guatemala and Columbia.   At the end of the 18-page Article is a short 7-paragraph section that references Ecuador.  The final section on Ecuador leads with the statement that Chiquita "used the trust structure to set up supposedly independent banana farm companies in Ecuador," citing as source material a "March 1992 internal company report." The Article states that the report, allegedly written by "Chiquita financial analyst Paul M. White" (hereafter "White report"), describes "the company's rationale for restructuring its Ecuadoran operations…."  (Doc. 2-1 at 14, PageID 34).  The 7-paragraph Ecuador section also cites to and quotes from a February 1992 "internal memo from Chiquita lawyer David Hills" that allegedly describes "how the company's Ecuadoran operations would be restructured under foreign trusts…." (*Id.*, emphasis added).  It is clear from the quotations that the Hills memo discusses then *future* plans by Chiquita, post-dating the February 1992 memo.  The Article concludes: "The restructuring outlined in Mr. Hills' memo never became fully operational because there was glut of bananas in the European market and prices plummeted in 1992, forcing the banana company to halt its expansion plans in [Ecuador] at that time…."  (*Id.*)

A number of lawsuits quickly arose after publication of the series of articles - in part because the exposé used voicemails that had been illegally obtained from Chiquita's voicemail system by lead reporter Michael Gallagher and a former Chiquita in-house lawyer, George Ventura.[4]  In one case, the Sixth Circuit summarized the fallout:

---

[4]The second reporter, Cameron McWhirter, was not alleged to have any knowledge of the wrongdoing by his co-author.

4

> [A] few weeks after the initial publication…, Chiquita demonstrated to the newspaper that Gallagher had illegally invaded the voice-mail system.
>
> As a result of these revelations, the Enquirer fired Gallagher on June 26, 1998, and demanded, both orally and in writing, that he return all Enquirer property in his possession including files, tape recordings, and notes. The Enquirer also publicly apologized for Gallagher's misconduct and paid Chiquita more than $10 million in a settlement.

*Ventura v. The Cincinnati Enquirer*, 396 F.3d 784, 788 (6th Cir. 2005). Both Gallagher and Ventura were investigated and ultimately convicted of charges relating to the unauthorized access. *Id.*

As stated by the Sixth Circuit, The Enquirer retracted the entire series of articles, including but not limited to the Article at issue in the current discovery dispute. The language of the retraction was unequivocal. "The Enquirer has now become convinced that the above representations, accusations and conclusions are untrue and created a false and misleading impression of Chiquita's business practices." (Doc. 2-2 at 12, PageID 143). "We have withdrawn the articles from continued display on the Enquirer's Internet website and renounce the series of articles." (*Id.*)

### C. The Subpoena

Plaintiffs seek discovery from The Enquirer, in part, as a means to prove up the retracted Article's references to Chiquita's operations in Ecuador, which Plaintiffs assert are relevant to "core" claims in the *Marquinez* case. The original subpoena listed 15 broad categories of documents, including the two reporters' complete personnel files. Although the subpoena has not been amended, Plaintiffs narrowed their requests during a meet and confer process to correspond to Topics 3, 4, 7, 8, 9 and 10 in the original subpoena.

1. All documents …regarding either (1) the Nominee form of ownership or (2) the Trust form of ownership used by Chiquita, and any of Chiquita's affiliates or subsidiaries, to structure ownership of banana growing operations in Ecuador as described in [the Article].

2. The 1992 report written by financial analyst Paul M. White regarding the ownership structure of Ecuadoran banana growing operations identified in [the Article].

3. All documents …pertaining to the case captioned *Ventura v. Cincinnati Enquirer, et al.*, No. 1:99-cv-00793-HJW-JS (S.D. Ohio)…

4. All documents …pertaining to the lawsuit case captioned *Chiquita Brands Intl v. Gallagher*, No. 1:8-cv-00467-SJD (S.D. Ohio)….

5. All documents…produced in the State of Ohio's investigation into George Ventura's actions related to [the Article]….

(Doc. 9-34 at 6, email correspondence).[5]

### D. Plaintiffs' Two Prior Attempts to Obtain the Information

The instant subpoena represents Plaintiffs' third attempt to obtain either the same or substantially similar information.

### 1. Plaintiffs' Motion to Compel in the Underlying Delaware Case

Plaintiffs first tried to obtain the information from Defendant Chiquita in the underlying case. In April 2020, Plaintiffs moved to compel Chiquita to produce additional documents related to Chiquita's alleged banana operations in Ecuador from 1965 to 1985, including evidence of business relationships with 62 banana plantations where Plaintiffs were employed and the March 1992 White financial report referenced in the Article. (*See*

---

[5]Plaintiffs imply that they further narrowed the five topics listed in the email during an oral conference on October 29, (Doc. 9 at 12), but which topics were further narrowed is not readily apparent to this Court.

Doc. 308 in Case No. 1: 12-cv-695-RGA).    At a hearing held on April 23, 2020, U.S. Magistrate Judge Fallon denied the motion to compel.  The Enquirer has filed a copy of the transcript as an exhibit to its motion to quash.  (Doc. 2-2; *see also* Doc. 315 in Case No. 1:12-cv-RGA).

The Delaware Court spent considerable time discussing Plaintiffs' request for the White report.  In response to Plaintiffs' motion, Chiquita questioned whether the White report had ever existed, given that its existence was based solely on the fully retracted Article. (Doc. 2-4 at 4). Chiquita further stated that it had searched for the alleged report "for several months, has not located it, and …has no reason to believe that it ever existed." (*Id.*)  Chiquita explained that its HR records reflected that Paul White was not a "financial analyst" as reported in the Article and had nothing to do with Chiquita's Ecuadorian operations but was instead a country manager for Russia who resided in the Czech Republic. (Doc. 310 in Case No. 1:12-695-RGA; *see also* Doc. 2-2, Transcript at 20; PageID 151).  Judge Fallon similarly questioned, based upon The Enquirer's retraction, whether the White report "ever existed." (Doc. 2-2 at 9-11, PageID 140-142). The Court denied Plaintiffs' motion based upon The Enquirer's unequivocal retraction of the Article as "untrue."  "[T]he Court will not …allow a motion to compel something that was retracted, determined to be untrue as part of an entire series that had been published, and was withdrawn, retracted, and deemed to be untrue." (*Id.* at 13, PageID 144).

Plaintiffs' counsel conceded that The Enquirer's retraction "is as broad as I think the Court is reading it," but argued that "it was the product of resolution of litigation" and

"there was no expressed denial that these documents [including the White report] existed." (*Id.*) Judge Fallon was unmoved. "The motion to compel a report, should any exist, which the Court is highly doubtful of, is denied." (*Id.* at 21, PageID 152). Judge Fallon also denied Plaintiffs' motion to compel any other documents from Chiquita relating to alleged banana operations or activities in Ecuador.

## 2. Plaintiffs' Subpoena to a Former Enquirer Reporter

Plaintiffs did not object to Magistrate Judge Fallon's order before the district judge. Instead, they subpoenaed the co-author of the Article in the Northern District of Georgia, Cameron McWhirter, seeking his testimony and production of most of the same decades-old documents that are sought from The Enquirer herein. McWhirter moved to quash the subpoena. *See Marquinez v. Dole*, Case No. 1:20-cv-4834-CAP. On December 2, 2020, U.S. Magistrate Judge Salinas granted the motion to quash in its entirety. The Enquirer has filed a copy of the hearing transcript, which was incorporated into the court's one-page order, as an exhibit to its reply. (Doc. 10-1).

At the Georgia hearing, Plaintiffs confirmed that "essentially we're seeking to establish the veracity of what was in the exposé." (*Id.* at 8, PageID 1585). McWhirter sought to quash the subpoena based upon Georgia's "Shield Law" and a qualified journalistic privilege recognized in the Eleventh Circuit. The hearing focused on whether the privilege had been waived or could be overcome. Importantly, the three factors on which the Court focused were whether the information is: (1) material and relevant to Plaintiffs' claims; (2) could not be reasonably obtained by alternative means; and (3) is

necessary to the proper preparation or presentation of the underlying case. The Georgia court found for McWhirter and against Plaintiffs on all three factors.

Beginning with whether the requested materials are relevant, material, or necessary to prove Chiquita's involvement in Ecuador, Judge Salinas first noted that the Article barely mentioned operations in Ecuador:

> [T]here's a lot of stuff in the article about Honduras, right, like, super specific stuff about Honduras, then it has a little bit about Columbia and then maybe somewhere else, and then it kind of ends with Ecuador. It kind of – I mean, in a certain way it fizzles out, because the last sentence of it is they didn't do it. I mean, to me it sounds like [Chiquita] ultimately didn't do it in Ecuador.

(Doc. 10-1at 17, PageID 1594). Judge Salinas expressed additional concerns with the need for the materials after hearing that Plaintiffs were "trying to establish … how much of [the] reporting was credible versus … what were the internal discussions at the Enquirer about the retraction." (Doc. 10-1 at 19, PageID 1596). The court responded:

> I'm still just not sure where that gets you. I mean, you're still in – you're still not to the heart of it. I still feel like you're in a weird hearsay land that that -- whether or not the article is true, it was published. You know, you've got the back story of why it was retracted, it was retracted. So -- but the whole point of it is, did Chiquita own land in Ecuador during this certain period of time. I don't know that you've connected those dots.

(*Id.* at 19-20, PageID 1596-97). Consistent with the Delaware court's analysis, Judge Salinas stated that even asserting the existence of the 1992 White report[6] based upon a retracted newspaper article written in 1998 "seems to be rank speculation" and "a big fishing expedition." (Doc. 10-1 at 17, PageID 1584).

---

[6]McWhirter had filed a declaration stating that he not only did not possess the White report or know its content, but that he could not recall ever having seen or read the White report. (*Id.* at 16, PageID 1593).

The Georgia court also questioned the relevance of the information after the reporter's counsel pointed out that the underlying complaint did not allege Chiquita's involvement in Ecuador, and after noting the pesticide use allegedly stopped in 1985, whereas Plaintiffs sought a 1992 report referenced in a 1998 Article. "Is there a – am I wrong in wondering about that time difference…in terms of relevance?" (Doc. 10-1 at 21, PageID 1598). While insisting that Chiquita's presence in Ecuador remains at issue, Plaintiffs' counsel neither cited to specific allegations in the Delaware complaint that allege Chiquita's involvement in Ecuador, nor connect the disparate time periods. Instead, counsel conceded that Chiquita's involvement "could have been pled more clearly in the complaint" and stated that "we're in the process of amending it to clarify it." (*Id.* at 22, PageID 1599). As of the date of this Order, no motion to amend has been filed in the underlying Delaware *Marquinez* case.

Last, Judge Salinas found that Plaintiffs had failed to show that they could not obtain the information through better sources, and/or alternative means that were less reliant on hearsay, calling the reporter is "the least best" person from whom to obtain the information. She pointed out that Plaintiffs appeared to have done little to subpoena the Chiquita employees "that you think were the ones, you know, making this plan and setting up the [Ecuadoran] trusts…." (*Id.* at 18, PageID 1595). Judge Salinas stated Plaintiffs could have filed objections to Magistrate Judge Fallon's order before the presiding district judge, but failed to do so. (Id. at 30, PageID 1607). She questioned Plaintiffs' strategy of seeking the same information from a reporter. "[Y]ou know, it doesn't seem to me that

means that you throw your hands in the air and then try to go get exactly what [Judge Fallon] said you can't have from the reporter."  (*Id.* at 31, PageID 1608).

## II.    Analysis

The Enquirer seeks to quash the subpoena on grounds that the information sought by the subpoena is beyond the scope of discovery under Rule 26(b)(2), and is not material, relevant, or necessary to prove Plaintiffs' claims in the Delaware case.  The Enquirer further asserts that the subpoena should be quashed based upon the two prior adverse discovery rulings concerning the same or similar information.  Third, The Enquirer maintains that the subpoena should be quashed because it seeks to have The Enquirer act as Plaintiffs' "discovery agent" in a fishing expedition that would impose an extraordinary burden on the non-party newspaper.  Last, The Enquirer suggests that the subpoena should be quashed because it seeks material subject to attorney client and work product privileges, as well as material that could be privileged under Ohio's journalistic Shield Law.  The undersigned agrees with The Enquirer that the subpoena should be quashed.

### A.  The Enquirer's Burden

As the moving party, The Enquirer has the burden to prove it is entitled to relief. *See* Fed. R. Civ. P. 45(c)(3);  *Baumgardner v. Louisiana Binding Serv.,* No. 1:11cv794, 2013 U.S. Dist. LEXIS 27494, at *4, 2013 WL 765574 (S.D. Ohio Feb. 28, 2013).  "The scope of discovery under a subpoena is the same as the scope of discovery under Rule 26." *Hendricks v. Total Quality Logistics,* 275 F.R.D. 251, 253 (S.D. Ohio 2011).  To fall

within that scope, the materials sought at a minimum must be "nonprivileged" and "relevant to any party's claim or defense and proportional to the needs of the case...." Rule 26(b)(1).

This Court retains the discretion "to limit the scope of discovery where the information sought is overly broad or would prove unduly burdensome to produce." *Surles ex rel. Johnson v. Greyhound Lines, Inc.,* 474 F.3d 288, 305 (6th Cir. 2007). Upon a showing of "good cause," a court may forbid discovery "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Rule 26(c)(1). In addition, under Rule 26(b)(2)(C), a court "must limit" discovery that "is unreasonably cumulative or duplicative" or if "the party seeking discovery has had ample opportunity to obtain the information by discovery in the action" or if "the proposed discovery is outside the scope permitted by Rule 26(b)(1)."

### B. The Subpoena Seeks Irrelevant Material and Would Unduly Burden the Nonparty Newspaper

The Enquirer begins by arguing that the subpoena seeks information outside the scope of discovery. Alternatively, even if the materials are relevant, The Enquirer contends that the subpoena should be quashed as unduly burdensome.

> In considering whether the discovery sought is unduly burdensome, the Court considers whether "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, and the importance of the discovery in resolving the issues." Fed. R. Civ. P. 26(b)(2)(C)(iii).... In addition, "the status of a person as a non-party is a factor that weighs against disclosure."

*Vietnam Veterans of America v. C.I.A.*, 2011 WL 4714000, at *5 (S.D. Ohio 2011) (quoting *American Elec. Power Co., Inc. v. U.S.,* 191 F.R.D. 132, 136 (S.D. Ohio 1999) (additional citations omitted)).

Given that the 2012 *Marquinez* Complaint on its face does not allege that Chiquita controlled any farms in Ecuador, Plaintiffs face an uphill battle to show that any of the documents requested by the subpoena are relevant to any claim or defense.  Without citing to any allegations in the underlying Complaint, Plaintiffs continue to insist that a "significant aspect of liability turns on the conduct of whichever multi-national grower, including Chiquita, owned, operated, or otherwise controlled one or more of 62 plantations at issue" in Ecuador.  (Doc. 9 at 4, PageID 289).  Second, Plaintiffs maintain that proof of Chiquita's involvement in Ecuador will support other claims that allege "Chiquita's participation and assistance and conspiracy with other Defendants." (Doc. 9 at 5, PageID 290).  Finally, and again without citation to any specific answer, motion, or other documents in the underlying case,[7] Plaintiffs suggest that the information is relevant to "any defense asserted by Dole that Chiquita's predecessors were the Associate Producers' partners on certain plantations" in Ecuador.  (*Id.*)[8]

Plaintiffs' unsupported assertions that they seek to establish "that Chiquita owned, operated, or otherwise controlled banana plantations in Ecuador," (Doc. 9 at 17, PageID

---

[7]Plaintiffs more generally cite to a motion to dismiss filed by Chiquita and the Delaware court's denial of the same motion, but the cited docket entries do not correspond to the referenced documents in Delaware Case No. 1:12-cv-695.  (*See* Doc. 9 at 10, citing Docs. 185, 225, 242).

[8]Although Dole appears to be a named Defendant, a recently filed motion for summary judgment states that "Dole is not a party to the *Marquinez* action." (*See, e.g.,* Doc. 334 at PageID 12049 in Case No. 1:12-cv-695).

13

302), and that the requested materials "would support core allegations," (Doc. 9 at 18, PageID 303), are unpersuasive.  Plaintiffs have failed to cite to any such "core allegations" in the underlying Complaint. The temporal scope of the discovery sought also lacks relevance.  The alleged toxic exposure occurred from the 1960s to 1985, whereas the 1998 Article (at most) speaks to Chiquita's attempts to restructure its holdings in various Latin American countries in the 1990s, years after the pesticide exposure at issue.  Thus, the requested materials do not appear to be relevant to any claim or defense at issue in the underlying case so as to fall within the scope of discovery.

Even if Plaintiffs could point to a specific claim or allegation regarding Chiquita's role in Ecuador prior to 1985, the undersigned agrees with the Delaware court that the fact that The Enquirer explicitly retracted the Article as "untrue" seriously undermines the relevance of the decades-old supporting materials that newspaper may have retained, if they ever existed.  And again, in context, the Article barely mentions Ecuador. Contemporaneous editor's notes confirm that the well-traveled reporters never visited Ecuador.[9]  As the Georgia court pointed out, the sole reference to Ecuador occurs in a short section at the end of the 18-page article that references the alleged White report and the Hills memo.  The Article concludes that the 1992 plans discussed in the Hills memo were never put into place.  Thus, even if the 1992 White report and/or Hills memo existed, Plaintiffs' position that those documents could be used to prove an (apparently

---

[9]During their research for the Article, former editor Lawrence Beaupre stated that the reporters had traveled to "Costa Rica, Honduras, Panama and the Caribbean islands of St. Lucia and Dominica" as well as to "Brussels, Antwerp, Vancouver, New York and Washington, D.C."   (Doc. 9-9, Exhibit 8).

non-existent) allegation in the underlying Complaint that Chiquita owned or operated farms in Ecuador prior to 1985 is widely speculative.

The Enquirer also has amply demonstrated that a thorough search for such materials would be unduly burdensome, based upon a comparison of the (purely hypothetical) relevance of the materials and the burden that Plaintiffs seek to impose upon the newspaper to search for decades-old materials that appear unlikely to exist. The "proportionality" concerns for discovery of questionable relevance from a party differs from that which can be obtained from a non-party, for good reason.   Here, proportionality considerations alone would preclude such a blatant fishing expedition.  In other words, given the remote likelihood of relevance of the discovery sought and The Enquirer's non-party status, the subpoena directed to The Enquirer is *not* appropriately proportional to the claims at issue.

Leaving aside the separate issues of privilege, documents relating to satellite litigation spawned by The Enquirer's retracted 1998 exposé fall even further outside the scope of discovery.  For example, the primary claim in the *Ventura* case was whether The Enquirer breached its contract with Ventura not to identify him as a source of information for the Chiquita Report.  Both the criminal and civil cases against reporter Gallagher concerned Gallagher's alleged unauthorized access to the Chiquita voicemail system and have nothing to do with Chiquita's alleged involvement with the use of a pesticide in Ecuador prior to 1985.  Plaintiffs fail to make any reasonable argument linking the requested materials to any claim or defense in the underlying case.

### C.  The Persuasive Reasoning of Two Courts' Prior Rulings

Pursuant to Rule 26(b)(2)(C)(i) and (ii), a court must limit discovery that is "unreasonably cumulative or duplicative" if **"**the party seeking discovery has had ample opportunity to obtain the information by discovery in the [underlying] action."  The Enquirer accuses Plaintiffs of seeking "an end run" around the Delaware court's adverse ruling in the underlying case, and urges this Court to follow the reasoning of both the Delaware court and the recent ruling by the Georgia court in denying nearly identical requests.  In response, Plaintiffs argue that they are not bound by the Delaware court's ruling because that court denied their prior motion to compel discovery from Chiquita "without prejudice." They attempt to distinguish the reasoning of the Georgia court as based primarily on privileges that are not recognized in Ohio or by the Sixth Circuit.  Neither of Plaintiffs' arguments is persuasive.

First, Plaintiffs had ample opportunity to obtain the White report and much more relevant and probative discovery directly from Defendant Chiquita in the Delaware case. It should go without saying that the best source of evidence to prove any involvement of Chiquita in Ecuador during the relevant time frame is Chiquita officials and employees alleged to have been involved at that time.  Plaintiffs filed a motion to compel and were granted a full hearing on the issues presented.[10]  The Delaware court made a clear ruling that the White report was not sufficiently relevant or material to the issues in dispute, in

---

[10]The court declined to address some issues because Plaintiffs had failed to fully exhaust extrajudicial efforts to resolve them with Chiquita prior to seeking relief from the court.

light of the unequivocal retraction of the 1998 Article as "untrue" in its entirety. Following up Judge Fallon's denial of the motion to compel the White report (the existence of which was seriously called into question), counsel asked "if the plaintiffs develop additional information supporting the existence of the document, I'd like to know that we wouldn't be violating the Court's order to then pursue that in discovery." (Doc. 2-2 at 36, PageID 167). The Court responded that all discovery rulings "are typically without prejudice" with the understanding that discovery is "a continual and updated process." (*Id.*) Respectfully, the undersigned is doubtful that the Delaware court intended for Plaintiffs to subpoena the White report from the very same newspaper that retracted the entire Article as "untrue" decades ago. And, although the Delaware court's ruling was without prejudice, that does not mean that it has no impact on this Court's analysis under Rule 26(b)(2)(C). Plaintiffs had ample opportunity to object to Magistrate Judge Fallon's order before the district judge, and/or to seek out other Chiquita records or witnesses who could better prove the existence of Chiquita's alleged activities in Ecuador during the relevant time frame than through the discovery now sought from The Enquirer.

The Georgia court's ruling emphasizes the same point. Plaintiff readily concedes that the Georgia subpoena sought "nearly identical documents" (Doc. 9 at 13, PageID 298) and the undersigned finds the current requests to be both cumulative and duplicative of the prior rejected requests. Although the Georgia court granted the motion to quash on the basis of state and federal privileges that do not exist in this jurisdiction,[11] the court's

---

[11] *See In re Grand Jury Proceedings*, 810 F.2d 580 (6th Cir. 1987).

analysis remains highly persuasive. In considering whether the asserted privilege could be overcome, Judge Salinas focused on distinct elements that align with those considered by this Court under Rule 26(b)(2)(C), including relevance, materiality, and Plaintiffs' opportunity to pursue more probative evidence directly from Chiquita.

Plaintiffs seek to turn the "cumulative" analysis on its head, suggesting that this Court should deny the motion to quash *because* it failed in its prior efforts to obtain the documents from Defendant Chiquita. Plaintiffs further accuse The Enquirer of "spoiling of documents" by "deep-six[ing] its own Article records, reporters' notes, and documents…at the behest of counsel and as part of a deal it struck with Chiquita to muzzle its journalists and disentangle itself from further legal problems with Chiquita." (Doc. 9 at 16, PageID 301, citing *Ventura v. Cincinnati Enquirer*, No. 1:99-cv-793 (S.D. Ohio Aug. 7, 2001).[12] The insinuation of some nefarious purpose by The Enquirer and its counsel based upon the newspaper's actions in unrelated litigation that occurred many years before Plaintiffs subpoenaed the records from the paper has no basis in fact or law. And to suggest that The Enquirer's adherence to alleged terms of a 2003 contractual settlement amounts to some type of bad faith or legal spoliation is reprehensible. Criticism of the Enquirer's actions in the unrelated litigation is simply not relevant to Plaintiffs' cause in *this* case.

---

[12]Plaintiffs seek depositions in the *Ventura* case discarded after the entry of judgment in Chiquita's favor. Plaintiffs admit the records appear to be retained in Sixth Circuit archives but were not requested until November 2020, at which time Plaintiffs were notified that the records are currently "unavailable for reproduction and digitization because of COVID-19." (Doc. 9 at 9, PageID 294; Doc. 9-35 at 2, PageID 1565).

### D.  Asserted Privileges and the "Special Status" of a Newspaper

In addition to being outside the scope of discovery and unduly burdensome, The Enquirer seeks to quash the subpoena based upon its likely assertion of attorney client and work product privileges, at least for materials contained in litigation files from three unrelated cases.[13]   However, Plaintiffs dispute the applicability of *any* privilege to materials filed of public record.  The Enquirer also asserts that the materials relating to the Article may be covered by a state law privilege under Ohio's journalistic "shield law," *see* Ohio R.C. 2739.12 – a privilege that Plaintiffs argue applies only to sources and not to "materials."  Finally, The Enquirer urges this Court to consider its particular status as a nonparty newspaper being asked to respond to extremely broad discovery requests.

The undersigned declines to reach the parties' specific arguments on privilege because there is no particular document before the court to evaluate, and because it is abundantly clear that the motion to quash should be granted on other grounds.  However, the undersigned will briefly address The Enquirer's status as a nonparty newspaper.  That status remains an appropriate factor to consider in determining whether the civil discovery request is unduly burdensome.

The Sixth Circuit's repudiation of any qualified journalistic privilege is not to the contrary.   In *Grand Jury Proceedings*, the Sixth Circuit cautioned that "courts should…make certain that the proper balance is struck between freedom of the press and

---

[13]The Enquirer concedes that it has not located responsive documents and therefore does not claim a specific privilege.

19

the obligation of all citizens to give relevant testimony," taking into consideration whether the testimony sought amounts to harassment, or whether the discovery is sought in good faith, "whether the information sought bears more than a remote and tenuous relationship to the subject of the investigation, and whether a legitimate law enforcement need will be served by forced disclosure of the confidential source relationship." *Id.*, 810 F.2d at 586. The undersigned agrees with the sentiment expressed by the court in *In re DaimlerChrysler AG Securities Litigation*, 216 F.R.D. 395, 406 (E.D. Mich. 2003): "Given the important role that newsgathering plays in a free society, courts must be vigilant against attempts by civil litigants to turn non-party journalists or newspapers into their private discovery agents." *Id.*

The *DaimlerChrysler* court reasoned that the fact that the non-party is part of the press should  be considered in the context of the "proper balance" required under *In re Grand Jury Proceedings*.  Consideration of the particular burden imposed upon a nonparty member of the press also is consistent with proportionality concerns.

> "If the parties to any lawsuit were free to subpoena the press at will, it would likely become standard operating procedure for those litigating against an entity that had been the subject of press attention to sift through the press files in search of information supporting their claims. The resulting wholesale exposure of press files to litigant scrutiny would burden the press with heavy costs of subpoena compliance, and could otherwise impair its ability to perform its duties—particularly if potential sources were deterred from speaking to the press, or insisted on remaining anonymous, because of the likelihood that they would be sucked into litigation ... And permitting litigants unrestricted, court-enforced access to journalistic resources would risk the symbolic harm of making journalists appear to be an investigative arm of the judicial system, the government, or private parties."

*In re DaimlerChrysler AG Securities Litigation*, 216 F.R.D. at 406 (quoting *Gonzales v.*

*Nat'l Broadcasting Co., Inc.,* 194 F.3d 29, 35 (2nd Cir. 1999)).

The fact that The Enquirer is a newspaper is neither irrelevant nor dispositive.  At the end of the day, it is simply one more factor that adds to the totality of circumstances. Considering that totality, it is clear that the burden on The Enquirer to produce the requested documents vastly outweighs any hypothetical benefit to the Plaintiffs.

**III.  Conclusion and Order**

For the reasons discussed herein, The Enquirer's motion to quash (Doc. 1) is GRANTED, and this miscellaneous matter is closed.

IT IS SO ORDERED.

*Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge